# Exhibit A
# Part I

EFiled: May 23 2005 7:58PM EDT
Filing ID 5875054

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| COOL DOT LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| PMT INVESTMENTS LLC and | ) | |
| PATRICK M. THOMPSON, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KOOL PRODUCTS LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## COMPLAINT

Plaintiff Cool Dot Ltd. ("CoolDot"), by its undersigned attorneys, for its Complaint, alleges as follows:

### Nature of This Action

1.    PMT Investments LLC ("PMT") and its principal and alter ego, Patrick M. Thompson ("Thompson") (collectively, "Defendants"), entered into an agreement with CoolDot, to test and combine CoolDot's intellectual property with a particular type of building material – oriented strand board ("OSB") – so as to make the OSB fire retardant, and then to market and sell the fire retardant OSB in the United States as a new product. This agreement was later embodied in an LLC agreement (the "LLC Agreement") that established a Delaware limited liability company known as Kool Products LLC ("Kool Products") to carry out this business venture. A true and correct copy of the LLC Agreement is attached hereto as Exhibit A.

2.    This action involves a scheme by Defendants to defraud CoolDot, misappropriate CoolDot's funds, and obtain intellectual property rights from CoolDot to which Defendants were not entitled. In doing so, Defendants willfully and wantonly breached their duties under the oral or implied-in-fact agreement between CoolDot and Defendants that preceded the formal LLC Agreement, breached the specific terms of LLC Agreement, and breached their fiduciary duties to CoolDot and Kool Products.

3.    Specifically, the Defendants, among other things: (1) failed to fulfill their duties under the oral or implied-in-fact agreement between CoolDot and Defendants that preceded the formal LLC Agreement, and under the LLC Agreement; (2) cannot account for the funds that they received from CoolDot; (3) concealed improvements to CoolDot's intellectual property from CoolDot; (4) actively sought to alter CoolDot's intellectual property in order to wrestle ownership rights away from CoolDot; (5) refused to comply with CoolDot's requests that Defendants work with other persons CoolDot designated to work on the Kool Products project; (6) knowingly misrepresented the progress of testing on CoolDot's intellectual property, the state of Kool Products relationship with the companies it was conducting testing with, and the amount of time Thompson was devoting to Kool Products; and (7) have attempted to compete with Kool Products.

4.    Therefore, CoolDot has brought this action against Defendants for: (1) breach of fiduciary duties; (2) breach of the LLC agreement; (3) breach of the oral or implied-in-fact contract between CoolDot and Defendants that preceded the formal LLC Agreement or, in the alternative, to recover from Defendants the amounts by which they were unjustly enriched due to their breach of the implied-in-law contract between CoolDot and Defendants; (4) breach of fiduciary duties owed to a joint venture partner; (5) fraudulent misrepresentations; (6) a

declaratory judgment which decrees that any and all improvements and changes to CoolDot's intellectual property belong to CoolDot; and (7) an order dissolving Kool Products pursuant to 6 *Del. C.* § 18-801, *et seq*.

5.      By this action, CoolDot also seeks injunctive relief to enjoin and restrain Defendants from all activities relating to the confidential information of Kool Products and the intellectual property of CoolDot, and an accounting.

## The Parties and Other Relevant Persons

6.      Plaintiff CoolDot is a privately held corporation organized and operated pursuant to the laws of the Cayman Islands, with its principal place of business in the Cayman Islands.

7.      CoolDot invests in specific types of startup business projects that are entrepreneurial driven marketing opportunities. CoolDot's focus is on supporting projects that have the strong potential to benefit all parties concerned, including the customer, the company, the employees, and the communities that they serve. In some cases, CoolDot provides proprietary intellectual properties as well as financial resources to the projects in which it invests. Currently, CoolDot is involved in two lines of the business: providing fire retardant solutions to the building industry, and the manufacture of commercial chiller controls for the purpose of energy optimization.

8.      Upon information and belief, defendant PMT is a Tennessee limited liability company, located at 3100 West End Avenue, Suite 1000, Nashville, Tennessee 37203.

9.      Upon information and belief, defendant Thompson resides at 132 Ensworth Avenue, Nashville, Tennessee 37205. Thompson is the President and agent of PMT.

10.    On information and belief, PMT does not observe corporate formalities, and does not keep its finances separate and distinct from Thompson, such that PMT and Thompson are the alter egos of one another.

11.    Nominal defendant Kool Products is a Delaware limited liability company formed by CoolDot and PMT on June 15, 2004 pursuant to a Certificate of Formation filed with the office of the Delaware Secretary of State.

12.    In early 2003, Defendants entered into an oral or implied-in-fact agreement with CoolDot to test and combine CoolDot's intellectual property with a particular type of building material – OSB – so as to make the OSB fire retardant, and then to market and sell the fire retardant OSB in the United States as a new product. From the outset, each party contributed to the enterprise, with Thompson contributing contacts and expertise, while CoolDot contributed its intellectual property and funding.

13.    On June 15, 2004, a Certificate of Formation for Kool Products LLC was filed with the office of the Delaware Secretary of State, which formally established Kool Products as a Delaware limited liability company. On or about November 4, 2004, PMT, through its agent and alter ego Thompson, formally entered into the LLC Agreement with CoolDot, thereby memorializing the terms of the parties' agreement. All business conducted jointly by CoolDot and the Defendants was done in furtherance of Kool Products.

14.    Pursuant to the LLC Agreement, PMT became a Member and the Operations Manager of Kool Products, and CoolDot became a Member and the Executive Manager of Kool Products. PMT's responsibilities as Operations Manager included managing the day-to-day activities of Kool Products pursuant to the decisions and directives of the Executive Manager.

- 4 -

15.     The LLC Agreement provided CoolDot with an 80% interest in Kool Products, while the remaining 20% interest belonged to PMT. The LLC Agreement further provided that distributions from Kool Products will be made in the following order of priority: first, to the members of Kool Products in proportion to their respective capital contributions until each member has received distributions equal to all of its cash capital contributions to Kool Products; second, to the members until each member has received distributions equal to a 5% annual preferred return on its capital contributions; and third to the members in accordance with their respective percentage interests in Kool Products.

16.     As the principal agent and alter ego of PMT, Thompson was the *de facto* Operations Manager of Kool Products and was responsible for performing the duties required of that position under the LLC Agreement.

17.     Non-party Charles Smith ("Smith") is an agent and representative of CoolDot. As CoolDot's representative, Smith carries out the tasks of CoolDot and frequently served as the liaison between CoolDot and the Defendants.

### Factual Background

Early Contacts Between CoolDot and Defendants

18.     In late 2002, Smith was introduced to Thompson, who described himself as having contacts in the treated lumber industry. Smith then offered Thompson a business proposal in connection with certain intellectual property, including patented chemical compounds and processes, owned by Smith's employer, CoolDot ("CoolDot's Intellectual Property").

19.    CoolDot's Intellectual Property includes a fire retardant chemical compound and process. CoolDot's Intellectual Property is designed to be used on fabricated wood products and other compound fabricated products.

20.    Historically, when a fabricated wood product was treated with fire retardant chemicals, it was put into a tank and sprayed with the product. The chemicals would penetrate the fabricated wood product, however, and this process would weaken the fabricated wood product. CoolDot's Intellectual Property is superior to products already on the market because it is designed to treat fabricated wood products without affecting their long-term durability.

21.    More specifically, CoolDot's Intellectual Property includes, but is not limited to, (i) U.S. Patents 6,566,424 (Fire Retardant Cellulosic Materials), (ii) U.S Patent No. 6,569,362 (Fire Retardant Aqueous Compositions), (iii) U.S. Patent No. 6,713,542 (Method for Producing a Flame Retardant Cellulosic Sheet Material) and (iv) U.S. Patent No. 6,596,202 (Flame Retardant Glue Composition and Method for Making the Same).

22.    Smith's proposal to Thompson stated that the Defendants and CoolDot would form a new US entity, which would be known as Kool Products. The ownership structure was to provide CoolDot with an 80% ownership stake in Kool Products, while the remaining 20% share belonged to Defendants.

23.    Smith's proposal further stated that CoolDot would license the rights to manufacture and sell CoolDot's Intellectual Property (for use specifically with OSB) in the United States to Kool Products. CoolDot would also agree to invest the necessary working capital for the initial phase of the project.

- 6 -

24.    In return, PMT, through Thompson, would manage the day-to-day aspects of the company, would manage and oversee testing of CoolDot's Intellectual Property with the OSB products it would eventually be combined with, and would provide wood manufacturing expertise as well as contacts within the lumber industry.

The Parties Enter Into an Agreement

25.    Thompson agreed to the proposal offered by CoolDot on behalf of PMT in early 2003, and accepted his (Thompson's) designated role in the creation and operation of Kool Products.

26.    Although the parties did not execute a formal agreement until on or about November 4, 2004, the basic terms and principles that were eventually embodied in the LLC Agreement were conveyed to Thompson at the same time Smith made the business proposal to him in late 2002.    Since early 2003, the parties have been operating in accordance with these terms and principles.

The Defendants Begin Their Misrepresentations

27.    Over the next 18 months, Thompson informed CoolDot that he was in the process of testing the ability of CoolDot's Intellectual Property to combine with wood products at three different facilities:    a wood manufacturing facility called Norbord Industries, Inc. ("Norbord"), a testing facility at the University of Mississippi, and another testing facility at SGS SA, a company world-renowned for inspection, verification, testing and certification.

28.    On July 16, 2003, Thompson emailed CoolDot with the results from one of the tests he purportedly oversaw.  Thompson wrote to CoolDot, "The results show that we can produce boards that are structurally sound which is a big deal for fire retardant boards as earlier attempts by others have failed miserably in the structural soundness area."

- 7 -

29.    In February of 2004, having already received over $450,000 in funding from CoolDot, Thompson called Smith requesting between $50,000 and $60,000 in additional funding for the Kool Products project, and also sought $26,500 per month (for himself, and for Charles "Trey" Bain, III, whom Thompson described as his partner) as compensation for devoting a majority of his time to the development, testing, and improvement of CoolDot's Intellectual Property.

30.    Because it appeared (erroneously, as it was later learned) that work was being done and progress was being made on testing and combining CoolDot's Intellectual Property with OSB, CoolDot agreed to Thompson's request for additional funding.

31.    Thereafter, CoolDot paid Defendants $26,500 per month, as an advance on PMT's share of any future profits of Kool Products, in consideration for Thompson devoting a majority of his time to the development, testing, and improvement of CoolDot's Intellectual Property.

32.    By November of 2004, Defendants had received over $1.1 million from CoolDot, for the funding, research and testing of CoolDot's Intellectual Property with OSB.

33.    Although Defendants had represented to CoolDot that Thompson was devoting a majority of his time to the development, testing, and improvement of CoolDot's Intellectual Property during this time period, only later did CoolDot learn that Thompson was in fact only minimally involved in these activities.

34.    Instead, on information and belief, Thompson had delegated most of the responsibility for these duties to his son, Patrick Thompson, Jr. ("Jr."). He did so, despite the fact that under the terms of the agreement between the parties reached in early 2003, which were

- 8 -

later included in the LLC Agreement, Thompson was required to maintain significant day-to-day involvement with Kool Products.

35.    At all relevant times, Thompson concealed from CoolDot the fact that Jr. was handling Thompson's responsibilities in connection with Kool Products.

36.    Only after CoolDot spoke directly to Norbord many months later was the true nature of Thompson's involvement (or lack thereof) in Kool Products revealed.

The Parties Enter Into the LLC Agreement

37.    On June 15, 2004, a Certificate of Formation for Kool Products LLC was filed with the office of the Delaware Secretary of State, which formally established Kool Products as a Delaware limited liability company.

38.    On or about November 4, 2004, PMT, through its agent and alter ego Thompson, formally entered into the LLC Agreement with CoolDot, thereby memorializing the terms of the parties' agreement.

39.    Pursuant to Sections 3.1 and 6.1 of the LLC Agreement, PMT (and Thompson as PMT's agent and alter ego), became a Member and the Operations Manager of Kool Products, while CoolDot became a Member and the Executive Manager of Kool Products.

40.    Pursuant to Section 6.1(b) of the LLC Agreement, the Operations Manager is to "manage the day-to-day activities of [Kool Products] pursuant to the decisions and directives of the Executive Manager."

41.    In addition, the Operations Manager had several other specific responsibilities and duties. They included: devoting a majority of its time and attention to, and using its best efforts to advance, the business and welfare of Kool Products; compiling monthly, quarterly or annual reports for submission to the Executive Manager as required; managing cash

flows of Kool Products pursuant to the specific cash management system attached to the LLC Agreement; and preparing annual budgets and business plans and related items.

42.    While the Operations Manager was responsible for managing the day-to-day activities of Kool Products, the following matters, among others, required the specific prior written consent of the Executive Manager: (1) any expenditure if such expenditure is not included in the Budget or exceeds a line item set forth in the Budget by five percent (5%) or more in any calendar month; (2) any reimbursement by Kool Products of any out-of-pocket expenses incurred by the Operations Manager; and (3) any delegation by the Operations Manager of any of its duties or obligations under the LLC Agreement other than to employees of the Operations Manager (collectively, the "Events Requiring Approval").

43.    Pursuant to Section 6.1(a) of the LLC Agreement, the Executive Manager is entitled to appoint any person in its sole discretion it deems necessary and appropriate to perform the Operation Manager's duties, and is also entitled to designate any such person as a director or officer.

44.    The LLC agreement further provides in Section 7.2(b) that the Operations Manager shall be personally liable for: (1) any breach of the duty of loyalty to Kool Products or its members (i.e., CoolDot); (2) acts or omissions not in good faith, or which involve intentional misconduct or a knowing violation of the law; (3) any unlawful distribution under the LLC Act; or (4) any transaction from which he derives an improper personal benefit.

45.    Pursuant to Article VIII of the LLC Agreement, CoolDot granted Kool Products a nonassignable and nontransferable right to use and make improvements to CoolDot's Intellectual Property solely within the United States, and PMT agreed to contribute all right, title

and interest in the trademark, tradename and brand "Flamedex" that was then held by Flamedex

L.L.C. or PMT (the "Flamedex Trademark Interests") to Kool Products.

46.   Importantly, Section 8.1(b) of the LLC Agreement provides that:

> If [Kool Products] or any of its employees, consultants or agents modifies
> or improves [CoolDot's Intellectual Property], [Kool Products] shall
> disclose such modification or improvement to CoolDot immediately and
> provide to CoolDot such documentation as is reasonably necessary for
> CoolDot to understand, evaluate and utilize such modification or
> improvement. Any such modification or improvement shall be deemed a
> part of [CoolDot's Intellectual Property] for all purposes hereunder.

47.   Moreover, Section 5.4 of the LLC Agreement requires Kool Products to

advance $26,500 to PMT monthly, so long as: (1) PMT remains a Member of Kool Products; and

(2) "Thompson is devoting a majority of his time and attention to, and using his best efforts to

advance, the business and welfare of [Kool Products]." Advances are to be treated as a

preliminary distribution of future distributions owed to PMT pursuant to the LLC Agreement.

48.   Finally, Section 8.4 of the LLC Agreement, entitled "Confidential

Information," declares that:

> Any information relating to this Agreement, any [of CoolDot's Intellectual
> Property] or the business of [Kool Products] is hereinafter referred to as
> "Confidential Information." All Confidential Information in tangible form
> (plans, writings, drawings, computer software and programs, etc.) or
> provided to or conveyed orally or visually, shall be presumed to be
> proprietary to [Kool Products] at the time of delivery to any Member. All
> such proprietary information shall be protected by such receiving Member
> from disclosure with the same degree of care with which the receiving
> Member protects its own Confidential Information from disclosure, but in
> no event with less than a reasonable degree of care.   The receiving
> Member agrees (a) not to disclose Confidential Information to any Person
> except to those of its employees or representatives who need to know
> Confidential Information in connection with the conduct of its business
> and who have agreed in writing to maintain the confidentiality of such
> Confidential Information, and (b) that neither it nor any of its employees
> or representatives will use the Confidential Information for any purpose
> other than in connection with the conduct of its business pursuant to this
> Agreement.

CoolDot Requests Information from Thompson

49.    After the LLC Agreement was signed, CoolDot requested that Thompson provide it with information concerning the testing of CoolDot's Intellectual Property with OSB products that was purportedly taking place, as well as information concerning the expenses incurred by the Defendants and Kool Products for the testing and operations of Kool Products.

50.    Because PMT was the Operations Manager of Kool Products, and because the Defendants had been operating in such a role even before the LLC Agreement was signed, the Defendants had direct supervision and control of Kool Products' books, records, funds and operations.

51.    Defendants, however, refused to provide the requested accounting and testing information to CoolDot.

52.    In response to Defendants' failure to produce the financial and testing documents as requested, Smith confronted Thompson. Thompson responded that he would not produce any records until he received more funding from CoolDot.

53.    Upon information and belief, in direct contravention of the LLC agreement, Defendants have withheld documentation from CoolDot because they were using the disbursements wired to them by CoolDot to pay off their own expenses related to other personal ventures and unrelated to Kool Products.

CoolDot Asks Schulman To Work
With Thompson and Thompson Declines

54.    After the LLC Agreement was signed, CoolDot invited Dan Schulman ("Schulman"), an expert in the lumber industry, to work alongside Thompson in the Kool Products project.

55.    CoolDot and Smith believed that Schulman's involvement would add value because of his expertise and contacts in the lumber industry.

56.    At CoolDot's request, Schulman spoke to Thompson and informed him that he would be traveling to Nashville to help with the Kool Products project. Schulman further indicated that this would have no impact on Thompson's financial arrangement with CoolDot, and that he was coming to Nashville at CoolDot's request.

57.    When Schulman arrived at Kool Products' and PMT's offices in Nashville in late November of 2004, he spent several hours in meetings with Thompson. In these meetings, Schulman had substantial difficulty turning the conversations with Thompson to the topic of Kool Products. Instead, Thompson only wanted to talk about his efforts to build his medical business and his desire to convince CoolDot to fund his other ventures.

58.    In violation of Section 6.1(b) of the LLC Agreement, Thompson declared to Schulman that he would not allow Schulman to work with him in Nashville, despite the Executive Manager's explicit request that he do so.

59.    Shortly before Schulman arrived in Nashville, CoolDot learned that Norbord had ceased testing on CoolDot's Intellectual Property and was refusing to work with Kool Products any longer.

60.    In Schulman's meetings with Thompson, Thompson indicated that he did not know why Norbord had ceased testing on CoolDot's Intellectual Property. As described below, this assertion was subsequently determined to be false.

61.    The following day, at CoolDot's request, Schulman returned to Thompson's office to conduct a conference call with Thompson and other representatives of

- 13 -

CoolDot. However, upon his arrival, Schulman was asked to leave and Thompson remarked that he would not allow Schulman to take part in the conference call.

62.    Thompson was explicitly told by Schulman and Smith that CoolDot, as Executive Manager of Kool Products, wanted Schulman to assist in the Nashville operations. Thompson chose not to comply with this explicit directive from the Executive Manager.

Schulman Learns Norbord Stopped Work
With Kool Products Because of Thompson

63.    Following Schulman's two-day meeting with Thompson in Nashville, Schulman spoke directly with Cameron Lewis ("Lewis"), a Norbord executive. Lewis informed Schulman that problems with Thompson, who was described as "too much of a cowboy," had forced Norbord to suspend its relationship with Kool Products.

64.    Specifically, Lewis informed Schulman that Norbord was no longer prepared to handle Thompson's "shoot from the hip approach" and its effect on the processes of testing and documentation of CoolDot's Intellectual Property. Lewis stated that Thompson repeatedly failed to provide the information requested by Lewis and when Norbord did receive the requested information, it was often severely delayed. He also complained that Thompson seemed to lack a plan for the business.

65.    Additionally, Lewis told Schulman that, despite repeated requests, Norbord never received any test results from Thompson of the tests that Thompson was reportedly conducting at the University of Mississippi. Instead, Thompson repeatedly told Norbord that it could not have the test results.

66.    At the time, Thompson was also willfully withholding the results of testing conducted at the University of Mississippi from CoolDot.

- 14 -

67.    Moreover, Thompson refused to provide Lewis with the makeup of the chemicals and the chemical process that Lewis was testing on the OSB. Lewis therefore became concerned about the safety of his employees who were supposed to conduct testing on the combination of CoolDot's Intellectual Property with OSB.

68.    Lewis also informed Schulman that Norbord was offended by Thompson's uncooperative nature, and had therefore ceased its relationship with Kool Products.

69.    Finally, Lewis informed Schulman that Thompson was very vague when asked who owned the process and patents for CoolDot's Intellectual Property. Norbord was uncomfortable with Thompson's failure to be more forthcoming on this important issue. According to Lewis, Thompson gave the impression that there was a dispute over the ownership rights of CoolDot's Intellectual Property.

70.    Upon information and belief, Defendants' scheme was to willfully conceal improvements to CoolDot's Intellectual Property from Norbord and CoolDot, believing that changes to the intellectual property had altered the ownership rights.

The Defendants' Misleading Statements Concerning
Test Results and Thompson's Involvement In Kool Products

71.    Lewis also told Schulman that despite Thompson's failure to provide the requested test results, Norbord had learned of the results of one study Thompson had been conducting concerning the long-term durability of OSB treated with CoolDot's Intellectual Property.

72.    While Thompson had indicated to CoolDot that the results of testing he was conducting were positive, the results obtained by Norbord showed that the test had returned an unsatisfactory score of 70% or less in comparison to approved standards. A satisfactory result required a score of 80% or better.

- 15 -

73.    Thompson never reported any of the information concerning unsatisfactory test results to Lewis, Norbord, Smith, Schulman or CoolDot. Rather, Thompson repeatedly and willfully provided Smith and CoolDot with fraudulent reports indicating that the testing was successful.

74.    Similarly, on December 6, 2004, Thompson reported to CoolDot, through both Smith and Schulman, that the latest round of testing by a new facility, Tembec Inc. ("Tembec"), had yielded "outstanding results."

75.    One week later, however, Tembec provided its own analysis of the testing to CoolDot. In its report to CoolDot, Tembec claimed that CoolDot's Intellectual Property was too risky for a variety of reasons and no mill trials would be undertaken.

76.    Upon information and belief, Thompson was aware of the problems with Norbord, and the unsatisfactory test results on CoolDot's Intellectual Property, but willfully chose to conceal these problems from CoolDot.

77.    Moreover, Thompson fraudulently concealed the limited nature of his involvement in the Norbord testing and Kool Products in general from CoolDot.

78.    Thompson falsely represented to Smith and CoolDot that he was devoting a majority of his time to advance the Kool Products business.

79.    On information and belief, Thompson was actually working on personal projects and it was his son Jr. who supervised the day-day to operations of Kool Products.

80.    In fact, Thompson's involvement was so limited that employees at Norbord thought that Jr. was running the operation for Kool Products.

81.    CoolDot detrimentally relied on Thompson's representations that he was devoting a majority of his time to the advancement of Kool Products when sending him the

- 16 -

monthly disbursements. Had CoolDot known that Thompson was not devoting his time to Kool Products the monthly disbursements would never have started or continued.

82.    CoolDot also detrimentally relied on Thompson's representations that testing on CoolDot's Intellectual Property was successful. Had CoolDot known that the testing was not successful, CoolDot would have removed Defendants as the Operations Manager.

83.    In December of 2005, Schulman again attempted to meet with Thompson at CoolDot's request. When Schulman traveled to Tennessee for this meeting however, Thompson refused to even meet with him.

Defendants Fail To Contribute the Flamedex Trademark
Interests to Kool Products, Misappropriate Kool Products'
Confidential Information and Compete With Kool Products

84.    Pursuant to Article VIII of the LLC Agreement, PMT agreed to contribute all right, title and interest in the "Flamedex Trademark Interests" to Kool Products.

85.    PMT never contributed the rights to the Flamedex name to Kool Products, as required by Section 8.2 of the LLC Agreement.

86.    Instead, upon information and belief, the Defendants have willfully misappropriated CoolDot's Intellectual Property and Kool Products' Confidential Information to compete with Kool Products.

87.    Upon information and belief, Thompson was working with a scientist by the name of Peter Kiproff to modify CoolDot's Intellectual Property for the Defendants' own benefit. These modifications were not disclosed to CoolDot.

88.    On information and belief, Thompson was diverting CoolDot's funds to develop a new product stemming from CoolDot's Intellectual Property, and was misappropriating CoolDot's and Kool Products' confidential and proprietary information.

- 17 -

89.    In fact, on at least one occasion, Thompson has indicated to CoolDot that improvements he made on CoolDot's Intellectual Property were now Thompson's own intellectual property.

90.    In May of 2005, Smith confronted Thompson with the allegation that Thompson was competing with Kool Products.

91.    Thompson did not deny Smith's allegation. Instead, Thompson stated that he was working with several other companies, one in Europe, to develop fire retardant OSB.

92.    Notably, the LLC Agreement does not license CoolDot's Intellectual Property to Kool Products (or Thompson or PMT) for use outside of the United States.

93.    During that same conversation, Thompson indicated to Smith that he had spent approximately $400,000 of additional funds on behalf of Kool Products for which he had yet to be reimbursed.

94.    However, Thompson never sought or received CoolDot's approval for such expenditures, if they were in fact made and Kool Products.

### COUNT I
(Breach of Fiduciary Duties)

95.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 94 as though fully set forth herein.

96.    Defendants, while working on behalf of Kool Products, and as the Operations Manager of Kool Products, had an obligation to act in and on behalf of the best interests of Kool Products and its Executive Manager, CoolDot, and owed duties of care, loyalty and good faith to CoolDot and Kool Products.

97.    Defendants breached their fiduciary duties by, among other things: (i) diverting funds disbursed by CoolDot away from Kool Products towards the advancement of

- 18 -

Thompson's personal business ventures; (ii) failing to use their best efforts to advance the business and welfare of Kool Products; (iii) concealing advancements and improvements made to CoolDot's Intellectual Property from CoolDot; (iv) attempting to refashion CoolDot's Intellectual Property in such a way that it would no longer belong to CoolDot; (v) failing to disclose the problems with Norbord; (vi) failing to disclose the problems with the testing of CoolDot's Intellectual Property; (vii) misappropriating company funds; (viii) misappropriating and misusing Kool Products' Confidential Information; (ix) directly competing with Kool Products; (x) failing to seek approval from CoolDot before engaging in Events Requiring Approval; and (xi) failing to disclose the entire scheme to CoolDot.

98.    The Defendants failed to exercise reasonable skill, care and business judgment while working on behalf of Kool Products.

99.    The Defendants failed to act in good faith, and in a manner reasonably believed by the Defendants to be within the scope of their authority under the LLC Agreement.

100.    The Defendants, either willfully or with gross negligence, failed to act in the best interests of Kool Products.

101.    As a direct and proximate result of the foregoing, CoolDot has suffered damages in an amount to be determined at trial.  Such damages include, but are not limited to: all compensation and salary paid to Defendants during Thompson's period of disloyalty; the funds improperly diverted away from Kool Products towards Thompson's personal business ventures, the funds improperly extracted from CoolDot as a result of Defendants' fraudulent scheme; and any profits unjustly realized by Defendants through their improper conduct.

- 19 -

## COUNT II
### (Breach of Contract for Breach of the LLC Agreement)

102.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 101 as though fully set forth herein.

103.    CoolDot has fully performed all of its obligations under the LLC Agreement.

104.    Defendants had contractual obligations to CoolDot as memorialized in the LLC Agreement.

105.    Defendants breached their contractual obligation by, among other things: (i) failing to compile monthly, quarterly or annual reports for submission to the Executive Manager as required by Section 6.1(c); (ii) failing to prepare and submit to CoolDot a budget within sixty days of the Effective Date and an update to the budget within thirty days after the end of each fiscal quarter; (iii) failing to seek approval from CoolDot before engaging in Events Requiring Approval; (iv) failing to grant Kool Products the Flamedex name as required by Section 8.2; (v) attempting to misappropriate CoolDot's Intellectual Property in violation of Section 8.1(b); (vi) refusing to work alongside Dan Schulman, per CoolDot's request, in violation of Section 6.1(a); (vii) misappropriating company funds; (viii) misappropriating Kool Products Confidential Information in violation of Section 8.4; (ix) directly competing with Kool Products; and (x) failing to devote a majority of Thompson's time and attention to, and using his best efforts to advance, the business and welfare of Kool Products despite receiving monthly distributions from CoolDot, in violation of Section 5.4.

106.    Defendants failed to exercise reasonable skill, care and business judgment while working on behalf of Kool Products.

107.    Defendants failed to act in good faith, and in a manner reasonably believed by the Defendants to be within the scope of their authority under the LLC Agreement.

108.    Defendants, either willfully or with gross negligence, failed to act in the best interests of Kool Products.

109.    As a direct and proximate result of the foregoing, CoolDot has suffered damages in an amount to be determined at trial.  Such damages include, but are not limited to: all compensation and salary paid to Defendants by CoolDot throughout the course of their business relationship; all disbursements paid to Defendants by CoolDot; all funds misappropriated from CoolDot by Defendants as a result of Defendants' fraudulent scheme; and any profits unjustly realized by Defendants as a result of their breach of the LLC Agreement.

## COUNT III
### (Breach of Oral Or Implied-In-Fact Contract)

110.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 109 as though fully set forth herein.

111.    For the twenty-month period directly preceding the signing of the LLC agreement on or about November 4, 2004, the words, actions and conduct of the parties to this action indicated that they were operating pursuant to the terms and conditions that were later expressly set forth in the formal LLC Agreement.

112.    By their words, actions and conduct during this time, Defendants indicated a manifest intent to be bound by the essential terms that were eventually memorialized in the LLC Agreement.

113.    The parties, through their words, actions, and conduct demonstrated a meeting of the minds on all essential terms of the contract.

114.    For example, Defendants held meetings with Norbord, performed testing on CoolDot's Intellectual Property, and made some (albeit false) status reports back to CoolDot. Defendants performed these services with an expectation that they would be paid, and in fact, accepted compensation for their services.

115.    CoolDot fully performed its obligations under the oral or implied-in-fact agreement that preceded the LLC Agreement and under the express terms of the LLC Agreement.

116.    The aforesaid acts referenced in Count II, constitute intentional and willful breach of the oral or implied-in-fact contract under Delaware law.

117.    As a direct and proximate result of the foregoing, CoolDot has suffered damages in an amount to be determined at trial. Such damages include, but are not limited to: all compensation and salary paid to Defendants by CoolDot throughout the course of their business relationship; all disbursements paid to Defendants by CoolDot; all funds misappropriated from CoolDot by Defendants as a result of Defendants' fraudulent scheme; and any profits unjustly realized by Defendants as a result of their breach of the implied-in-fact contract between the parties.

**COUNT IV**
(Breach of Implied-In-Law Contract/Unjust Enrichment)

118.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 117 as though fully set forth herein.

119.    For the twenty-month period directly preceding the November 4, 2004 signing of the LLC agreement, the words, actions and conduct of the parties to this action indicated that they were operating pursuant to the terms and conditions that were later set forth in the formal LLC Agreement.

120.    By their words, actions and conduct during this time, Defendants indicated a manifest intent to be bound by the essential terms that were eventually memorialized in the LLC Agreement.

121.    The parties, through their words, actions, and conduct demonstrated a meeting of the minds on all essential terms of the contract.

122.    For example, Defendants held meetings with Norbord, performed testing on CoolDot's Intellectual Property, and made some (albeit false) status reports back to CoolDot. Defendants performed these services with an expectation that they would be paid, and in fact, accepted compensation for their services.

123.    Based upon the foregoing, to the extent that no oral or implied-in-fact agreement existed prior to the execution of the LLC Agreement, the Court should find that an implied-in-law contract exists in order to prevent Defendants from being unjustly enriched at CoolDot's expense.

124.    CoolDot fully performed its obligations under the implied-in-law agreement that preceded the LLC Agreement and under the express terms of the LLC Agreement.

125.    The aforesaid acts referenced in Count II, constitute intentional and willful breach of the implied-in-law contract under Delaware law.

126.    As a direct and proximate result of the foregoing, CoolDot has suffered damages in an amount to be determined at trial. Such damages include, but are not limited to, the amounts Defendants received without justification, such as all compensation and salary paid to Defendants by CoolDot throughout the course of their business relationship; all disbursements paid to Defendants by CoolDot; all funds misappropriated from CoolDot by Defendants as a

result of Defendants' fraudulent scheme; and any profits unjustly realized by Defendants as a result of their breach of the implied-in-law contract between the parties.

## COUNT V
### (Breach of the Fiduciary Duty Owed to Joint Venturers)

127.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 126 as though fully set forth herein.

128.    Defendants entered into a joint venture with CoolDot as soon as they accepted CoolDot's proposal and began to work on behalf of Kool Products in early 2003. As a result, Defendants owed CoolDot fiduciary duties of care, loyalty, and good faith.

129.    The parties then began a joint venture for their mutual benefit, combining money, skill and knowledge.

130.    CoolDot has fully performed its obligations under the joint venture arrangement.

131.    Defendants breached their duties of care, loyalty and good faith owed to their joint venture partner by diverting funds disbursed by CoolDot away from Kool Products towards the advancement of Thompson's personal business ventures, by their failure to use their best efforts to advance the business and welfare of Kool Products, by concealing advancements and improvements made to CoolDot's Intellectual Property from CoolDot and its employees, by attempting to refashion CoolDot's Intellectual Property in such a way that it would no longer belong to CoolDot, by failing to disclose the problems with Norbord, by failing to disclose the problems with the testing of CoolDot's Intellectual Property, by misappropriating company funds, by misappropriating and misusing Kool Products' Confidential Information, by directly competing with Kool Products, and by failing to disclose the entire scheme to CoolDot.

- 24 -

132.    Defendants failed to exercise reasonable skill, care and business judgment while working on behalf of the Kool Products joint venture.

133.    Defendants failed to act in good faith, and in a manner reasonably believed by the Defendants to be within the scope of their authority under their joint venture arrangement with CoolDot.

134.    Defendants, either willfully or with gross negligence, failed to act in the best interests of the Kool Products joint venture.

135.    As a direct and proximate result of the foregoing, CoolDot has suffered damages in an amount to be determined at trial. Such damages include, but are not limited to: all compensation and salary paid to Defendants by CoolDot throughout the course of their business relationship; all disbursements paid to Defendants by CoolDot; all funds misappropriated from CoolDot by Defendants as a result of Defendants' fraudulent scheme; and any profits unjustly realized by Defendants as a result of their breach of the implied-in-fact contract between the parties.

## COUNT VI
### (Fraudulent Misrepresentation)

136.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 135 as though fully set forth herein.

137.    Defendants made a series of knowing misrepresentations and knowing omissions to CoolDot, upon which CoolDot relied to their detriment.

138.    Specifically, Defendants knew that Kool Products' relationship with Norbord had soured for a variety of reasons, chiefly involving Thompson's behavior, yet pled ignorance when asked why things were not moving forward with the testing.

139.    In addition, Defendants knowingly accepted monthly disbursements from CoolDot of $26,500, while representing that Thompson was devoting a majority of his time and attention to, and using his best efforts to advance, the business and welfare of Kool Products. In fact, Thompson had delegated most of the work for Kool Products to his son.

140.    Defendants also knowingly reported that the results of the testing by the Tembec facility were extremely positive, when in fact they were not positive.

141.    Defendants knowingly concealed negative test results on CoolDot's Intellectual Property from CoolDot and also provided CoolDot with falsified test results.

142.    Defendants knowingly accepted disbursements from CoolDot and misrepresented that the disbursements were being used to advance Kool Products, when in fact they were being used to advance Thompson's own business ventures.

143.    Defendants knowingly accepted disbursements from CoolDot, and misrepresented that that they were being used to advance Kool Products, when in fact such funds were being used in an attempt to alter CoolDot's Intellectual Property to such an extent that it would belong to Defendants.

144.    CoolDot relied on each of these fraudulent misrepresentations to its detriment, in that CoolDot continued to fund Defendants and Kool Products, allowed the Defendants to continue as the Operations Manager of Kool Products, and lost other potential business opportunities.

145.    CoolDot suffered damages as a direct and proximate result of the fraudulent conduct by Defendants, in an amount to be determined at trial.

## COUNT VII

(Declaratory Judgment Regarding the Proper Ownership of CoolDot's Intellectual Property )

146.   CoolDot repeats and realleges the allegations contained in paragraphs 1 through 145 as though fully set forth herein.

147.   As set forth above, a controversy has arisen regarding the ownership of CoolDot's Intellectual Property and any modifications thereto.

148.   CoolDot owns the intellectual property that is at the heart of this Complaint. It also owns any and all modifications to its intellectual property, pursuant to Section 8.1(b) of the LLC Agreement, which states:

> If [Kool Products] or any of its employees, consultants or agents modifies or improves [CoolDot's Intellectual Property], [Kool Products] shall disclose such modification or improvement to CoolDot immediately and provide to CoolDot such documentation as is reasonably necessary for CoolDot to understand, evaluate and utilize such modification or improvement. Any such modification or improvement shall be deemed a part of [CoolDot's Intellectual Property] for all purposes hereunder. In no event shall [Kool Products] have any ownership or other rights to such modification or improvement other than the right to use such modification or improvement pursuant to the Intellectual Property Right granted in Section 8.1(a).

149.   Notwithstanding the clear language of the LLC Agreement, Defendants have claimed that any improvements they made to CoolDot's Intellectual Property now belong to Defendants.

150.   Accordingly, CoolDot seeks a declaratory judgment that it is the sole and exclusive owner of the CoolDot Intellectual Property, including any changes and or modifications thereto that have been made by Defendants.

151.   CoolDot has no adequate remedy at law.

- 27 -

### COUNT VIII
#### (Decree of Judicial Dissolution of Kool Products LLC)

152.    CoolDot repeats and realleges the allegations contained in paragraphs 1 through 151 as though fully set forth herein.

153.    Section 11.1 of the LLC Agreement states that the entry of a decree of judicial dissolution under the LLC Act will serve as a "Dissolution Event." Upon such an event, Kool Products shall dissolve and commence winding up its affairs.

154.    Judicial dissolution is authorized pursuant to 6 *Del. C.* § 18-801, *et seq.*

155.    In light of the Defendants' aforesaid acts, it is no longer reasonably practicable to carry on Kool Products' business in conformity with the LLC Agreement. Accordingly, CoolDot is entitled to an order pursuant to 6 *Del. C.* § 18-802 decreeing that Kool Products LLC is dissolved.

156.    In addition, in light of the aforesaid allegations, CoolDot respectfully requests that the Court appoint CoolDot to wind up the affairs of Kool Products, instead of the Operations Manager (the entity otherwise designated in Section 11.2 of the LLC Agreement to wind up the affairs of the LLC).

157.    CoolDot has no adequate remedy at law.

WHEREFORE, CoolDot demands judgment in its favor:

(a)    awarding CoolDot and Kool Products compensatory and consequential damages in an amount to be determined at trial, plus interest allowable by law;

(b)    awarding CoolDot declaratory relief in the form of a judgment which decrees that pursuant to the LLC Agreement any and all improvements and changes to CoolDot's intellectual property belong to CoolDot;

(c)    awarding CoolDot injunctive relief, enjoining, and restraining Defendants from all activities relating to Kool Products' Confidential Information and CoolDot's Intellectual Property or any modifications thereto, including but not limited to, using, marketing, misappropriating or modifying CoolDot's Intellectual Property or any modifications thereto, or any products containing CoolDot's Intellectual Property or any modifications thereto, in any manner;

(d)    awarding CoolDot an accounting;

(e)    awarding CoolDot a decree of judicial dissolution of Kool Products LLC and appointing CoolDot to wind up the affairs of Kool Products;

(f)    awarding CoolDot and Kool Products the costs of suit, including attorneys' fees; and

(g)    awarding CoolDot and Kool Products such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL

William M. Lafferty (#2755)
Susan Wood Waesco (#4476)
1201 N. Market Street
Wilmington, Delaware 19801
(302) 658-9200
 Attorneys for Plaintiff Cool Dot Ltd.

OF COUNSEL:

Adam H. Offenhartz
David J. Kerstein
Oliver M. Olanoff
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
(212) 351-4000

May 23, 2005

*Execution Version*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## KOOL PRODUCTS LLC
### A Delaware Limited Liability Company

**Dated as of**

**November 4, 2004**

LIMITED LIABILITY COMPANY AGREEMENT

OF

KOOL PRODUCTS LLC
A Delaware Limited Liability Company

<u>TABLE OF CONTENTS</u>

ARTICLE I DEFINITIONS ................................................................................................1
    1.1        Definitions...........................................................................................1
    1.2        Construction........................................................................................1

ARTICLE II ORGANIZATION...........................................................................................1
    2.1        Formation............................................................................................1
    2.2        Name...................................................................................................1
    2.3        Registered Office; Registered Agent; Principal Office; Other Offices. ............1
    2.4        Purpose...............................................................................................2
    2.5        Term....................................................................................................2
    2.6        Powers................................................................................................2

ARTICLE III MEMBERSHIP; DISPOSITIONS OF INTERESTS ...............................................2
    3.1        Initial Members...................................................................................2
    3.2        Restrictions on Transferability............................................................2
    3.3        Business Transactions with Members and Manager...........................2
    3.4        Liability to Third Parties....................................................................3
    3.5        Withdrawal.........................................................................................3

ARTICLE IV CAPITAL CONTRIBUTIONS ..........................................................................3
    4.1        Initial Contributions...........................................................................3
    4.2        Subsequent Contributions...................................................................3
    4.3        Return of Contributions. ....................................................................3

ARTICLE V ALLOCATIONS AND DISTRIBUTIONS .............................................................4
    5.1        Allocation of Profits and Losses. .......................................................4
    5.2        Distributions.......................................................................................4
    5.3        Taxable Income Distributions.............................................................4
    5.4        Advances to PMT. .............................................................................5
    5.5        Withholding. ......................................................................................5

ARTICLE VI MANAGER; OFFICERS ................................................................................5
    6.1        The Executive Manager and the Operations Manager.......................5
    6.2        Action by Written Consent. ...............................................................7

i

6.3    Compensation. ..................................................................................7
6.4    Conflicts of Interest. ..........................................................................7
6.5    Third Parties. .....................................................................................7
6.6    Meetings of Members. ........................................................................7

ARTICLE VII LIABILITY AND INDEMNIFICATION................................................8
7.1    Liability. .............................................................................................8
7.2    Liability and Indemnity of the Managers............................................8

ARTICLE VIII GRANT OF RIGHTS TO FLAMEDEX PRODUCTS; CONFIDENTIAL
       INFORMATION. ................................................................................9
8.1    Grant of Rights to Flamedex Products.................................................9
8.2    Grant of Flamedex Name....................................................................10
8.3    Limitations on Rights; Termination....................................................10
8.4    Confidential Information. ...................................................................10

ARTICLE IX TAXES..................................................................................................11
9.1    Tax Returns. ......................................................................................11
9.2    Tax Elections. ....................................................................................11
9.3    Tax Matters Partner............................................................................11

ARTICLE X BOOKS, RECORDS, AND BANK ACCOUNTS ...................................11
10.1   Maintenance of Books. ......................................................................11
10.2   Accounts. ...........................................................................................11

ARTICLE XI DISSOLUTION, LIQUIDATION, AND TERMINATION ....................12
11.1   Dissolution. .......................................................................................12
11.2   Winding Up, Liquidation and Distribution of Assets. ........................12
11.3   Deficit Capital Accounts.....................................................................13
11.4   Certificate of Cancellation. ...............................................................13

ARTICLE XII GENERAL PROVISIONS ...................................................................13
12.1   Notices. ..............................................................................................13
12.2   Entire Agreement. ..............................................................................14
12.3   Effect of Waiver or Consent. .............................................................14
12.4   Amendment or Modification...............................................................14
12.5   Binding Effect; No Third Party Beneficiaries. ..................................14
12.6   Governing Law; Severability..............................................................14
12.7   Counterparts.......................................................................................15

## EXHIBITS

EXHIBIT A – Definitions
EXHIBIT B – Capital Contributions and Percentage Interests
EXHIBIT C – Milestones
EXHIBIT D – Tax Allocations
EXHIBIT E – Cash Management

LIMITED LIABILITY COMPANY AGREEMENT
OF
KOOL PRODUCTS LLC
A Delaware Limited Liability Company

This Limited Liability Company Agreement of Kool Products LLC (this "Agreement"), dated as of November 4, 2004 (the "Effective Date"), is executed and agreed to, for good and valuable consideration, by the Members (as defined below).

ARTICLE I
DEFINITIONS

1.1     Definitions.

Except as otherwise provided for in this Agreement, the terms defined in Exhibit A attached hereto shall, for purposes of this Agreement, have the meaning therein specified.

1.2     Construction.

Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is made a part hereof for all purposes.

ARTICLE II
ORGANIZATION

2.1     Formation.

The Company has been organized as a Delaware limited liability company by the filing of a Certificate of Formation (the "Certificate") with the office of the Delaware Secretary of State as required under and pursuant to the Act. The rights and obligations of the Members shall be as provided in the Act, except as otherwise provided herein.

2.2     Name.

The name of the Company is "Kool Products LLC" and all Company business must be conducted in that name or such other names that comply with applicable law as the Operations Manager (as defined below) may select from time to time.

2.3     Registered Office; Registered Agent; Principal Office; Other Offices.

The registered office of the Company shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Operations Manager may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the

initial registered agent named in the Certificate or such other Person or Persons as the Operations Manager may designate from time to time in the manner provided by law. The principal place of business of the Company and any other offices of the Company shall be at such locations as the Operations Manager may designate from time to time.

    2.4    <u>Purpose</u>.

The purpose of the Company is to transact any and all lawful business for which limited liability companies may be organized under the Act.

    2.5    <u>Term</u>.

The Company commenced on the date of the filing of the Certificate of the Company with the Secretary of State of Delaware and shall continue in existence perpetually or until such time as this Agreement may specify.

    2.6    <u>Powers</u>.

The Company shall possess and may exercise any and all the powers and privileges granted by the Act or by any other applicable law to limited liability companies or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

## ARTICLE III
## MEMBERSHIP; DISPOSITIONS OF INTERESTS

    3.1    <u>Initial Members</u>.

The initial Members of the Company are listed on <u>Exhibit B</u>. Each Member is admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Agreement.

    3.2    <u>Restrictions on Transferability</u>.

Notwithstanding any other provision of this Agreement, no Member shall without the prior written consent of each other Member, by operation of law or otherwise, voluntarily or involuntarily, sell, assign, transfer, exchange, lease, mortgage, charge, hypothecate, pledge or otherwise convey or encumber ("<u>Transfer</u>") any right, title or interest in or to the Company nor in or to any assets of the Company nor enter into any agreement as a result of which any Person will or can obtain any interest in the Company, and any and all attempts to do otherwise shall be null and void and of no force or effect whatsoever.

    3.3    <u>Business Transactions with Members and Manager</u>.

Each Manager and Member may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide

2

collateral for, and transact other business with the Company and, subject to applicable law, shall have the same rights and obligations with respect to any such matter as a Person who is not a Manager or a Member.

3.4    Liability to Third Parties.

No Manager or Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

3.5    Withdrawal.

A Member does not have the right or power to withdraw from the Company as a member.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.1    Initial Contributions.

Contemporaneously with the execution by a Member of this Agreement, each Member shall make the initial Capital Contributions set forth beside the name of such Member on Exhibit B.

4.2    Subsequent Contributions.

Except as provided in Section 4.1, this Section 4.2 and Section 8.2, no Member shall have any obligation to make any Capital Contribution. Subsequent Capital Contributions may be made from time to time only with the consent of all Members. Notwithstanding the foregoing, CoolDot shall make additional Cash Capital Contributions of up to an aggregate amount of $2,500,000 (exclusive of the Capital Contributions made on the Effective Date) in installments as reasonably requested by the Operations Manager in writing and as necessary to fund the Company's operations in accordance with the Budget; provided that CoolDot shall not be required to make any such Cash Capital Contribution if the Company has either (i) ceased operations on or prior to the date of such written request or (b) failed to reach any milestone set forth on Exhibit C as of the deadline established for such milestone. CoolDot shall have the right to make Cash Capital Contributions of up to $2,500,000 at any time without the consent of any other Member until the total amount of additional Cash Capital Contributions made by CoolDot equals $2,500,000 (exclusive of the Capital Contributions made on the Effective Date). Promptly following the making of any subsequent Capital Contribution by any Member, the Operations Manager shall amend Exhibit B to reflect the adjusted amount of Cash Capital Contributions of such Member.

4.3    Return of Contributions.

A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contribution. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not

required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contribution.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

5.1   Allocation of Profits and Losses.

Profits and Losses (as defined in Exhibit D) shall be allocated among the Members in accordance with the provisions of Exhibit D.

5.2   Distributions.

Distributions shall be made, at the sole discretion of the Executive Manager, in the following order of priority:

(a) First, to the Members in proportion to their respective Cash Capital Contributions until each Member shall have received aggregate distributions pursuant to this clause (a) equal to its aggregate Cash Capital Contributions;

(b) Second, any remaining distributable funds shall be distributed to the Members until each Member shall have received aggregate distributions pursuant to this clause (b) equal to a 5% cumulative annual preferred return, compounded annually, on the average daily balance of its unreturned aggregate Cash Capital Contributions; and

(c) Thereafter, any remaining distributable funds shall be distributed to the Members in proportion to their respective Percentage Interests.

5.3   Taxable Income Distributions.

Notwithstanding Section 5.2, prior to 90 days after the close of each Fiscal Year, the Company shall distribute to the Members an amount in cash necessary so that each Member has received cumulative cash distributions from the Company equal to 40% of such Member's cumulative allocable share of the Company's net income for tax purposes as reasonably estimated by the Executive Manager. At any time the Company makes a distribution pursuant to the preceding sentence, 20% of such distribution shall be made to PMT and 80% of such distribution shall be made to CoolDot. Any distributions to a Member under this Section 5.3 shall be treated as a preliminary distribution of future amounts due to such Member under Section 5.2, and any future distributions due to such Member shall be adjusted so that, to the greatest extent possible, aggregate distributions are made according to the priorities set forth in that Section. The Executive Manager shall not be required to make any distribution pursuant to this Section 5.3 unless the Company has cash available for such distribution and such distribution would otherwise be permitted under the Act.

5.4     Advances to PMT.

The Company shall make an advance distribution of $26,500 to PMT on or prior to the last day of each calendar month so long as (i) PMT is a Member of the Company and (ii) Patrick Thompson is devoting a majority of his time and attention to, and using his best efforts to advance, the business and welfare of Company. Any advance distribution made to PMT under this Section 5.5 shall be treated as a preliminary distribution of future amounts due to PMT under Section 5.2, and any future distributions due to PMT under Section 5.2 shall be adjusted so that, to the greatest extent possible, aggregate distributions are made according to the priorities set forth in that Section. Notwithstanding the foregoing, the Company shall have no obligation to pay any advance distribution to PMT pursuant to this Section 5.5 after the earlier of (1) the first date on which all advance distributions paid to PMT have been applied as an adjustment to distributions due to PMT under Section 5.2 in accordance with the preceding sentence or (2) the first date on which the Company has failed to reach any milestone set forth on Exhibit C as of the deadline established for such milestone on Exhibit C.

5.5     Withholding.

Each Member recognizes that the Company or any of its affiliates may be obligated by law to withhold and pay over, or otherwise pay, taxes with respect to such Member or as a result of such Member's participation in the Company. To the extent the Company shall be required to withhold any such tax with respect to any such Member, such Member shall be deemed for all purposes of this Agreement to have received a distribution with respect to such Member's interest in the amount of such tax upon the earliest to occur of (i) the day on which the tax is withheld or paid, (ii) the last day of the Company's taxable year for which such tax is withheld or paid, (iii) the last day on which such Member owned its interest or (iv) the day specified by law as constituting a deemed distribution for tax purposes.


ARTICLE VI
MANAGER; OFFICERS

6.1     The Executive Manager and the Operations Manager.

(a)     CoolDot shall act as the executive manager (the "Executive Manager") of the Company and shall make all decisions and take all actions for the Company unless otherwise provided in this Agreement. The Executive Manager (a) may appoint such person as it in its sole discretion deems necessary and appropriate to perform its duties hereunder and may designate any such person as a director or officer and (b) shall appoint such person as the Executive Manager in its sole discretion deems necessary and appropriate as the operations manager (an "Operations Manager") of the Company.

(b)     The Operations Manager shall manage the day-to-day activities of the Company pursuant to the decisions and directives of the Executive Manager and shall have

5

in respect of its management of the Company the designated powers of the Company. All material actions, decisions, determinations, designations, directions, appointments, consents, approvals, selections, and the like to be taken, made, or given by and/or with respect to the daily operations of the Company's business and its properties shall in each and every case be made by the Operations Manager. The initial Operations Manager of the Company shall be PMT.

(c)      Subject to the foregoing, the Operations Manager shall have the right, power and authority, on behalf of and in the name of the Company, to carry out the objectives and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings, which it may deem necessary or advisable or incidental thereto. Accordingly, the Operations Manager, except as otherwise provided in this Agreement, shall have the right, power and authority, on behalf of the Company, without limitation but subject to carrying out the purposes of the Company, to (i) oversee the daily operations of the Company, (ii) compile monthly, quarterly or annual reports for submission to the Executive Manager, as it so requires, (iii) prepare for submission to the Executive Manager, annual budgets and business plans and related items, (iv) negotiate any and all agreements, instruments, and documents, and (v) perform all acts that a manager may legally do pursuant to the Act that are consistent with the terms of this Agreement and are designed to carry out the purposes and business of the Company and the decisions and directives of the Executive Manager.

(d)      Notwithstanding any provisions hereof to the contrary, the following matters shall require the prior written consent of the Executive Manager

(i)      any expenditure by the Company if such expenditure is not included in the Budget or exceeds a line item set forth in the Budget by five percent (5%) or more in any calendar month;

(ii)     any secured or unsecured borrowings by the Company;

(iii)    any reimbursement by the Company of any out-of-pocket expenses incurred by the Operations Manager;

(iv)    any agreement with a term of greater than one year or with an aggregate value greater than $250,000;

(v)     any action with respect to any litigation or threat of litigation with third parties; and

(vi)    any delegation by the Operations Manager of any of its duties or obligations under this Agreement other than to employees of the Operations Manager.

(e) The business of the Company shall be managed in accordance with a budget approved by the Executive Manager (the 'Budget"). The Operations Manager shall prepare and submit to the Executive Manager a budget within 60 days of the Effective Date and an

update to the Budget within 30 days after the end of each fiscal quarter. When approved by the Executive Manager, such budget or update shall become the Budget for all purposes of this Agreement. The cash flows into and out of the Company shall be managed in accordance with the cash management system set forth in Exhibit E (the "Cash Management System"). The Operations Manager may amend the Budget or the Cash Management System at any time with the prior written consent of the Executive Manager.

6.2   Action by Written Consent.

Any action permitted or required by the Act, the Certificate, or this Agreement to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Members. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Members.

6.3   Compensation.

Each Manager and Member shall be entitled to be reimbursed for reasonable out-of-pocket costs and expenses incurred in the course of their service hereunder, but shall not be entitled to receive any other compensation for their services.

6.4   Conflicts of Interest.

The Company may transact business with any Manager, any Member or officer, or any affiliate thereof, provided that the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties and are approved by the Executive Manager.

6.5   Third Parties.

Any Person other than a Member dealing with the Company, may rely on the authority of any Manager or any designee of any Manager in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

6.6   Meetings of Members.

(a)   Annual meetings of the Members of the Company shall be held at such time, date and place as the Executive Manager shall determine.

(b)   Special meetings of the Members for any proper purpose or purposes may be called at any time by any Member.

(c)   All meetings of the Members of the Company shall be held at such places, within or without the State of Delaware, as may from time to time be designated by the

7

Executive Manager, in the case of annual meetings, or by the Person or Persons calling the special meeting, and specified in the respective notices or waivers of notice thereof. Any Member may participate in a meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

(d)    Except as otherwise required by law, notice of each meeting of the Members of the Company shall be given not less than twenty (20) nor more than sixty (60) calendar days before the date of the meeting to each Member of record entitled to vote at such meeting by delivering a typewritten or printed notice thereof to him personally, by depositing such notice with an express overnight or similar courier, direct to him at his post office address furnished by the Member to the Company, or by facsimile.

ARTICLE VII
LIABILITY AND INDEMNIFICATION

7.1    Liability.

No Member shall be liable, responsible or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, except for fraud or willful misconduct or an intentional breach of this Agreement.

7.2    Liability and Indemnity of the Managers.

(a)    In carrying out duties and exercising powers pursuant to this Agreement, each Manager shall exercise reasonable skill, care and business judgment. No Manager nor any of his or her agents shall be liable to the Company or the other Members for any act or omission based upon errors of judgment, negligence, or other fault in connection with the business or affairs of the Company so long as the Person against whom liability is asserted acted in good faith on behalf of the Company and in a manner reasonably believed by such Person to be within the scope of his or her authority under this Agreement and in the best interests of the Company, but only if such action or failure to act does not constitute gross negligence or willful misconduct. A Manager shall be entitled to rely upon the reports, advice and counsel of other professionals, including attorneys and accountants, in exercising his or her business judgment hereunder.

(b)    No Manager shall be personally liable for any debt, obligation or liability of the Company merely by reason of being a Manager or  liable to the Company or its Members for monetary damages for conduct as a Manager. A Manager who performs the duties as Manager in accordance with this Agreement shall not have any liability by reason of being or having been a Manager. The Company shall indemnify each Manager and make advances for expenses to the maximum extent permitted under the Act. However, this provision shall not eliminate or limit a Manager's liability for:

8

(1)    Any breach of a Manager's duty of loyalty to the Company or its Members as described in this Agreement;

(2)    Acts or omissions not in good faith which involve intentional misconduct or a knowing violation of law;

(3)    Any unlawful distribution under the Act; or

(4)    Any transaction from which any Manager derives an improper personal benefit

## ARTICLE VIII
## GRANT OF RIGHTS TO FLAMEDEX PRODUCTS;
## CONFIDENTIAL INFORMATION

8.1    Grant of Rights to Flamedex Products.

(a)    The Members agree that by executing this Agreement CoolDot hereby grants, in consideration of its rights hereunder, to the Company an exclusive, royalty-free, nonassignable and nontransferable right to make, have made, use, sell, offer to sell, import into and otherwise commercialize the Flamedex Products, and any improvements thereon, for use exclusively in the treatment of unfinished wooden boards and solely within the United States (the "Intellectual Property Right"). CoolDot shall provide the Company, promptly following execution of this Agreement, with a complete set of the documentation and materials in the possession of or under the control of CoolDot that embody and contain all of the existing trade secrets relating to such Flamedex Products and shall use commercially reasonably efforts to ensure that such material trade secrets have been promptly disclosed to the Company. Promptly upon the request of the Company, CoolDot shall provide the Company, in the form reasonably requested by the Company, any information in the possession or under the control of CoolDot relating to the Flamedex Products that is reasonably requested by the Company. The rights granted under this Section 8.1 may not be transferred, assigned or disposed of in whole or in part by the Company.

(b)    If the Company or any of its employees, consultants or agents modifies or improves the Flamedex Products, the Company shall disclose such modification or improvement to CoolDot immediately and provide to CoolDot such documentation as is reasonably necessary for CoolDot to understand, evaluate and utilize such modification or improvement. Any such modification or improvement shall be deemed a part of the "Flamedex Products" for all purposes hereunder. In no event shall the Company have any ownership or other rights to such modification or improvement other than the right to use such modification or improvement pursuant to the Intellectual Property Right granted in Section 8.1(a).

9

8.2    Grant of Flamedex Name.

Promptly following the Effective Date, PMT shall contribute to the Company, in exchange for no additional consideration, all right, title and interest in and to the Flamedex trademark, trade name and brand (including any trademark applications) held by Flamedex, L.L.C. or PMT as of the Effective Date (collectively, the "Flamedex Trademark Interests"). The Members acknowledge that such contribution (a) shall constitute a Capital Contribution, (b) shall not constitute a Cash Capital Contribution and (c) shall not affect the Percentage Interest of any Member.   Subject to Section 11.2(d), the Company shall not transfer, assign or dispose of the Flamedex Trademark Interests without the prior written consent of PMT.

8.3    Limitations on Rights: Termination.

(a)    Notwithstanding the foregoing, at any time after June 1, 2006 CoolDot may at its option revoke any or all of the rights granted in Sections 8.1 by delivery of written notice to the Company; provided that that such revocation shall only be effective if CoolDot agrees in writing at the time of delivery of such notice (a) to make or have made the Flamedex Products solely outside the United States and (b) to offer such Flamedex Products for sale to PMT at a price per unit as determined in good faith by CoolDot and PMT through arms-length negotiation and in accordance with an exclusive distribution agreement as agreed by CoolDot and PMT.

(b)    All rights and obligations of the parties under Section 8.1 shall terminate in accordance with Article XI.

8.4    Confidential Information.

Any information relating to this Agreement, any Flamedex Product or the business of Company is hereinafter referred to as "Confidential Information." All Confidential Information in tangible form (plans, writings, drawings, computer software and programs, etc.) or provided to or conveyed orally or visually, shall be presumed to be proprietary to Company at the time of delivery to any Member. All such proprietary information shall be protected by such receiving Member from disclosure with the same degree of care with which the receiving Member protects its own Confidential Information from disclosure, but in no event with less than a reasonable degree of care. The receiving Member agrees (a) not to disclose Confidential Information to any Person except to those of its employees or representatives who need to know Confidential Information in connection with the conduct of its business and who have agreed in writing to maintain the confidentiality of such Confidential Information, and (b) that neither it nor any of its employees or representatives will use the Confidential Information for any purpose other than in connection with the conduct of its business pursuant to this Agreement; provided, that such restrictions shall not apply if such Confidential Information (i) is or hereafter becomes public other than by a breach of this Agreement, (ii) was already in the receiving Member's possession and not subject to an obligation of confidentiality prior to any disclosure of the Confidential Information to the receiving Member, (iii) has been or is hereafter obtained by the receiving Member from a third party which to the knowledge of the receiving Member was not bound

by any confidentiality obligation with respect to the Confidential Information, (iv) is required to be disclosed pursuant to judicial order, but only to the extent of such order and after reasonable notice to the disclosing Member so as to allow the disclosing Member to intervene in any proceeding leading to such order, or (v) is required to be disclosed by any government authority which regulates the business of the receiving Member, but only to the extent of such required disclosure and after reasonable notice to the disclosing Member so as to allow the disclosing Member to intervene to seek confidential treatment.

ARTICLE IX
TAXES

9.1    Tax Returns.

The Executive Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 9.2.

9.2    Tax Elections.

All elections permitted to be made by the Company under federal or state laws shall be made by the Executive Manager in the Executive Manager's sole discretion.

9.3    Tax Matters Partner.

CoolDot is hereby designated by the Members to be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. The "tax matters partner" shall exercise any authority permitted the "tax matters partner" under the Code.

ARTICLE X
BOOKS, RECORDS, AND BANK ACCOUNTS

10.1    Maintenance of Books.

The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members. The books of account for the Company shall be maintained in accordance with the terms of this Agreement, except that the capital accounts of the Members shall be maintained in accordance with Exhibit D.

10.2    Accounts.

Subject to the supervision of the Executive Manager, the Operations Manager shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Operations Manager selects.

11

ARTICLE XI
DISSOLUTION, LIQUIDATION, AND TERMINATION

11.1    Dissolution.

The Company shall dissolve and commence winding up its affairs upon the first to occur of the following (each, a "Dissolution Event"):

(a)    the written consent of all the Members; and

(b)    entry of a decree of judicial dissolution of the Company under the applicable provisions of the Act.

11.2    Winding Up, Liquidation and Distribution of Assets.

(a)    Upon the occurrence of a Dissolution Event, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Operations Manager shall immediately proceed in good faith to wind up the affairs of the Company as directed by the Executive Manager.

(b)    Upon the occurrence of a Dissolution Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and the Members. Each Member shall act in good faith in connection with the winding up and liquidation of the Company and shall take no action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Company shall not enter into any new contract with any third party on or after the occurrence of a Dissolution Event. To the extent deemed advisable by the Executive Manager, the Operations Manager shall delay the final liquidation of the Company for a reasonable time so that the Company may satisfy its obligations under existing contracts with third parties. To the extent not inconsistent with the foregoing, all obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Section 11.3. At the direction of the Executive Manager, the Operations Manager shall oversee the winding up and dissolution of the Company, shall take full account of the Company's liabilities and property, shall cause the Company's property to be liquidated as promptly as is consistent with maximizing the value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

(i)    First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members; and

(ii)    Second, pursuant to the provisions of Section 5.2 of this Agreement.

(c)    All rights and obligations of the parties under Sections 8.1 shall automatically terminate five calendar days following the occurrence of a Dissolution Event, and on and

12

after such date CoolDot shall have all rights relating to the Flamedex Products that were granted to the Company on the Effective Date; provided that if the Executive Manager delivers written notice to the Company on or prior to the expiration of such five-day period requesting that such termination be delayed until such time as is specified in such written notice, such termination will be delayed until the time so specified. Notwithstanding the foregoing, CoolDot shall have no right to make, have made, use, sell, offer to sell, import into and otherwise commercialize the Flamedex Products in the United States, between the date of a Dissolution Event and the date of the final liquidation of the Company unless CoolDot agrees in writing to use commercially reasonable efforts to assist the Company in satisfying its obligations under contracts binding the Company that exist as of the date of the Dissolution Event.

(d)    All rights to the Flamedex Trademark Interests held by the Company pursuant to Section 8.2 shall automatically terminate five calendar days following the occurrence of a Dissolution Event, and on and after such date PMT shall have all rights relating to the Flamedex Trademark Interests that were contributed previously by PMT to the Company.

11.3    Deficit Capital Accounts.

Notwithstanding anything to the contrary in this Agreement, no Member shall be obligated to make any contribution to the capital of the Company in order to restore a deficit balance in its Capital Account (as defined in Exhibit D), and a negative balance of a Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

11.4    Certificate of Cancellation.

On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Operations Manager (or such other Person or Persons as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings of the Company, and take such other actions as may be necessary to terminate the Company.

ARTICLE XII
GENERAL PROVISIONS

12.1    Notices.

Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States or foreign mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested, or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and, except as otherwise provided in this Agreement, a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the

addresses given for that Member on Exhibit B, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be given to the Company at the following address: c/o 3100 West End Avenue, Suite 1000, Nashville, Tennessee 37203, with a copy to Gibson, Dunn & Crutcher LLP, 1050 Connecticut Ave., NW, Washington, DC 20036, Attn: Arthur Pasternak. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

    12.2   Entire Agreement.

    This Agreement, together with the Certificate, constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

    12.3   Effect of Waiver or Consent.

    A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

    12.4   Amendment or Modification.

    Subject to applicable law, this Agreement may be amended or modified from time to time by a written instrument executed by each Member.

    12.5   Binding Effect; No Third Party Beneficiaries.

    Subject to the restrictions on transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective successors and assigns. There are no third party beneficiaries of this Agreement.

    12.6   Governing Law; Severability.

    THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is

14

not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

      12.7   Counterparts.

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, following adoption of this Agreement the Members have executed this Agreement as of the date first set forth above.

MEMBER AND EXECUTIVE MANAGER:

COOL DOT LTD.,
   a Cayman Islands Company

By: _____
   Name: OSAMA ABUDAWOOD
   Title:

MEMBER:

PMT INVESTMENTS LLC,
   a Tennessee limited liability company

By: _____
   Name: Patrick Thompson
   Title:   President

16

EXHIBIT A

DEFINITIONS

"Act" means the Delaware Limited Liability Company Act, Del. Code Ann. tit. 6, § 18-101 *et seq.*, as amended from time to time, and any successor statute.

"Agreement" is defined in the preamble to this Agreement.

"Bankruptcy" means, with respect to any Person, (i) the entry of a decree or order for relief of such Person by a court of competent jurisdiction in any involuntary case involving such Person under any bankruptcy, insolvency or other similar law now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent for such Person or for any substantial part of such Person's assets or property; (iii) the ordering of the winding up or liquidation of such Person's affairs; (iv) the filing with respect to such Person of a petition in any such involuntary bankruptcy case, which petition remains undismissed for a period of ninety (90) days or which is dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by such Person of a voluntary case under any bankruptcy, insolvency or other similar law now or hereafter in effect; (vi) the consent by such Person to the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent for such Person or for any substantial part of such Person's assets or property; (vii) the making by such Person of any general assignment for the benefit of creditors; or (viii) the failure by such Person generally to pay its debts as such debts become due.

"Budget" is defined in Section 6.1(d)

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Cash Capital Contribution" means any contribution by a Member to the capital of the Company that is in the form of cash or cash equivalents. The term Cash Capital Contribution also will include the stock of Kool Products, Inc. as set forth in Exhibit B.

"Cash Management System" is defined in Section 6.1(d).

"Certificate" is defined in Section 2.1.

"Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Confidential Information" is defined in Section 8.4.

"CoolDot" means Cool Dot Ltd., a Cayman Islands company.

"Company" means Kool Products LLC, a Delaware limited liability company.

"Dissolution Event" is defined in Section 11.1.

"EBIDTA" means, for any period, the sum for the Company of the following:

(a)    net income (exclusive of any non-cash income); plus

(b)    interest expense, to the extent deducted in computing net income; plus

(c)    taxes, to the extent deducted in computing net income; plus

(d)    depreciation expense to the extent deducted in computing net income; plus

(e)    amortization expense, including amortization of goodwill and other intangible assets, non-cash amortization of capital leases, amortization of debt issuance costs and amortization of organization costs of the Company, in each case to the extent deducted in computing net income, plus

(f)    any non-cash write-downs and write-offs (other than write-downs and write-offs of current assets).

"Effective Date" is defined in the Preamble to this Agreement.

"Executive Manager" is defined is Section 6.1(a).

"First Milestone" means, with respect to the Company, Net Revenues of at least $60,271,860 and EBIDTA of $6,040,070 for the period commencing on the Effective Date and ending on June 30, 2005.

"Fiscal Year" shall mean the Company's fiscal year.

"Flamedex Products" means (a) products produced using or incorporating (i) U.S. Patents 6,566,424 (Fire Retardant Cellulosic Materials, (ii) U.S Patent No. 6,569,362 (Fire Retardant Aqueous Compositions), (iii) U.S. Patent No. 6,713,542 (Method for Producing a Flame Retardant Cellulosic Sheet Material) and (iv) U.S. Patent No. 6,596,202 (Flame Retardant Glue Composition and Method for Making the Same), (b) any know-how, formulas, methods, processes, systems and other proprietary information owned by or licensed to CoolDot concerning or relating to or that are or may be useful or necessary in the design, development, production, distribution, use, marketing or sale of any such products and (c) any proprietary information now or hereafter owned by or licensed to CoolDot that is not patentable or that CoolDot has elected to maintain as a trade secret and concerning or relating to or that is or may be useful or necessary in the design, development, production, distribution, use, marketing or sale of any such product.

"Flamedex Trademark Interests" is defined in Section 8.2.

"Intellectual Property Right" is defined in Section 8.1(a).

2

"Manager" means each of the Executive Manager and any Operations Manager.

"Member" means each of the Persons listed as such on Exhibit B.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, accounts and inspections and to consent or approve.

"Net Revenues" means, for any period, the sum of (i) gross revenues of the Company minus (ii) any discounts granted by the Company minus (c) any uncollectible debt owed to the Company.

"Operations Manager" is defined in Section 6.1(a).

"Percentage Interest" means, with respect to any Member as of any date, the percentage set forth beside the name of such Member on Exhibit B as of such date.

"Person is defined in Section 18-101(12) of the Act.

"PMT" means PMT Investments LLC, a Tennessee limited liability company.

"Transfer" is defined in Section 3.2 of this Agreement.

3

EXHIBIT B

## CAPITAL CONTRIBUTIONS AND PERCENTAGE INTEREST[1]

| Name and Address | Cash Capital Contributions | Percentage Interest |
|---|---|---|
| Cool Dot Ltd.<br>P.O. Box 1111<br>George Town, Grand Cayman<br>Cayman Islands | $832,995.31[2] | 80% |
| PMT Investments LLC<br>3100 West End Avenue, Suite 1000,<br>Nashville, Tennessee 37203 | 0 | 20% |
| TOTAL | $832,995.31 | 100% |

---

[1] The Members agree that the Cash Capital Contributions of CoolDot made as of the Effective Date shall include $657,995.31 that CoolDot contributed to the development of the business of the Company prior to the Effective Date.

[2] In addition to Cash Capital Contributions, CoolDot is making a Capital Contribution in the form of the intellectual property rights to the extent described in Section 8.1.

EXHIBIT C

MILESTONES

The Company shall complete the following milestones on or before January 31, 2005:

> (i) execute an agreement with a manufacturer, pursuant to which such manufacturer agrees to sell the Company's products at a price reasonably acceptable to the Executive Manager;

> (ii) commence production of Flamedex Products; and

> (iii) receive bona fide orders for the sale by the Company of Flamedex Products for an aggregate purchase price of at least $500,000.

The Company shall also satisfy each of the following milestones:

| | Effective Date to December 31, 2004 | Effective Date to March 31, 2005 | Effective Date to June 30, 2005 |
|---|---|---|---|
| NET REVENUE | - | $1,594,860 | $19,120,860 |
| EBITDA | - | - | $1,166,358 |

| | Effective Date to September 30, 2005 | Effective Date to December 31, 2005 | Effective Date to March 31, 2006 | Effective Date to June 30, 2006 |
|---|---|---|---|---|
| NET REVENUE | $50,271,860 | $93,607,180 | $127,102,180 | $166,597,180 |
| EBITDA | $6,040,870 | $12,512,226 | $17,301,633 | $22,091,039 |

| | Effective Date to September 30, 2006 | Effective Date to December 31, 2006 | Effective Date to March 31, 2007 | Effective Date to June 30, 2007 |
|---|---|---|---|---|
| NET REVENUE | $194,092,180 | $243,537,360 | $300,987,360 | $358,377,360 |
| EBITDA | $26,880,445 | $35,037,768 | $43,076,924 | $48,434,695 |

2

EXHIBIT D

TAX ALLOCATIONS

Section 1.    Allocations Of Profits And Losses.

1.1    In General.  For accounting and federal, state and local income tax purposes, all Profits and Losses shall be determined and allocated with respect to each year of the Company as of the end of such year and at such other times as the Executive Manager shall determine.  Subject to the other provisions of this Agreement, an allocation to a Member of a share of Profits or Losses shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profits or Losses.

1.2    Profits.  Subject to and after making any special allocations pursuant to Section 2 hereof, any remaining Profits for each fiscal year shall be allocated among the Members in the following manner:

1.2.1    First, among the Members in such a manner which corresponds, in reverse chronological order, to allocations of Losses pursuant to Section 1.3.4 hereof, until the cumulative Profits allocated to the Partners under this Section 1.2.1 equals the cumulative Loss allocated to the Partners under Section 1.3.4 for all prior periods;

1.2.2    Next,  among the Members in such a manner which corresponds, in reverse chronological order, to allocations of Losses pursuant to Section 1.3.3 hereof, until the cumulative Profits allocated to the Partners under this Section 1.2.2 equals the cumulative Loss allocated to the Partners under Section 1.3.3 for all prior periods;

1.2.3    Next, to the Members to the extent of and in proportion to the amount necessary to that each Member has been allocated Profits pursuant to this Section 1.2.3 (net of Losses allocated pursuant to Section 1.3.2) for the current and all prior fiscal years in an amount of  equal to the aggregate preferred return for such Member as calculated pursuant to Section 5.2(b) of the Agreement.;

1.2.4    Finally, any remaining Losses shall be allocated eighty percent (80%) to CoolDot and twenty percent (20%) to PMT.

1.3    Losses.  Subject to and after making any special allocations pursuant to Section 2 hereof, any remaining Losses for each fiscal year shall be allocated among the Members in the following manner:

1.3.1    First, among the Members in a manner which corresponds, in reverse chronological order, to the allocations of Profits pursuant to Section 1.2.4 hereof;

1.3.2    Next, among the Members in a manner which corresponds, in reverse chronological order, to the allocations of Profits pursuant to Section 1.2.3 hereof;

1

1.3.3. Next, among the Members, to the extent of and in proportion to the amount necessary to that each Member has been allocated for the current and all prior fiscal years an amount of Losses (net of Profits allocated pursuant to Section 1.2) equal to such Members aggregate Cash Capital Contribution;

1.3.4 Finally, to the Members in proportion to their respective Cash Capital Contributions.

1.4     Allocations in Anticipation of Liquidation. Notwithstanding Section 1.2 and Section 1.3, in any year in which the Company sells substantially all of its assets or liquidates (or in any prior open year if the Executive Manager reasonably believes it necessary to accomplish the purposes of this Section 1.4), each Member shall be allocated Profits or Losses (or items thereof) to the extent necessary to cause its Capital Account balance to reflect the amount that will be distributable to such Member in liquidation of the Company pursuant to the Agreement.

Section 2.     Regulatory Allocations.

2.1     Minimum Gain Chargeback. The Executive Manager shall allocate items of Company income and gain among the Members at such times and in such amounts as necessary to satisfy the minimum gain chargeback requirements of Regulation Sections 1.704-2(f) and 1.704-2(i)(4).

2.2     Qualified Income Offset. The Executive Manager shall specially allocate Losses and items of income and gain when and to the extent required to satisfy the "qualified income offset" requirement within the meaning of Regulation Section 1.704-1(b)(2)(ii)(d).

2.3     Loss Allocations. No allocation of Losses, or items thereof, will be made to any Member if such allocation would create or increase such Members' Adjusted Capital Account Deficit. Any such disallowed allocation will be made to the Members entitled to receive such allocation under the Section 704(b) Regulations. Any Member that would have a deficit balance in its Capital Account in excess of any amount such Member is obligated to restore, or is deemed obligated to restore under Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5), will be specially allocated items of income and gain to eliminate such deficit balance as quickly as possible.

2.4     Nonrecourse Deductions. Nonrecourse Deductions (within the meaning of Regulation Section 1.704-2) will be allocated (as nearly as possible) among the Members pro-rata in proportion to their respective Cash Capital Contributions.

2.5     Member Nonrecourse Deductions. Member Nonrecourse Deductions, within the meaning of Regulation Section 1.704-2(i), shall be allocated to the Member who has the economic risk of loss in a manner consistent with requirements of Regulation Sections 1.704-2(i)(2) and 1.704-2(j)(l).

2

2.6    Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-l(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

2.7    Guaranteed Payments. To the extent any compensation paid to any Member by the Company is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

Section 3.    Special Rules.

3.1.    Tax Allocations. Except as provided in Section 3.2 hereof, for federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each year shall be allocated to and among the Members to reflect the allocations made pursuant to the provisions of this Exhibit D for such year.

3.2.    Section 704(c) Compliance. In accordance with Section 704(c) of the Code and the applicable Regulations thereunder, income, gain, loss, deduction and tax depreciation with respect to any property which has a Book Basis different than its adjusted tax basis, will, solely for federal income tax purposes, be allocated among the Members in accordance with Section 704(c) of the Code and the Regulations thereunder to take into account such difference, using any method selected in the reasonable determination of the Executive Manager.

3.3.    Modifications. The Executive Manager shall be authorized to make appropriate amendments to the allocations of items pursuant to this Exhibit D if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder; provided that no such change shall have a material adverse effect upon the amount distributable to any Member hereunder.

3.4    Allocations on Transfer of Interests. In the event there is any Transfer of a Member's Membership Interest during any year, Profits, Losses and other items shall be allocated among the Members from time to time during such year in accordance with Code Section 706 using any convention permitted by law and selected in the reasonable discretion of the Executive Manager.

Section 4.    Capital Accounts.

4.1.    Establishment and Maintenance.  A separate capital account (each, a "Capital Account") will be maintained for each Member pursuant to the requirements set forth in Regulation Section 1.704-1(b)(2)(iv).  The Capital Account of each Member will be determined and adjusted as follows:

4.1.1.  Each Member's Capital Account will be credited with the fair market value of a Member's Capital Contributions, the Member's distributive share of Profits, and the amount of any Company liabilities that are assumed by the Member or secured by any Company property distributed to the Member.

4.1.2.  Each Member's Capital Account will be debited with the amount of cash and the Book Basis of any Company property distributed to the Member under any provision of this Agreement, the Member's distributive share of Losses and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by the Member to the Company.

4.1.3.  The Capital Account of the Member also shall be adjusted appropriately to reflect any other adjustment required pursuant to Regulation Section 1.704-1 or 1.704-2, including, without limitation, the requirements set forth in Regulation Sections 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(2)(iv)(m).

4.1.4.  If any Membership Interest is transferred in accordance with the terms of the Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

Section 5.    Other Matters.

5.1.    Distributions in Kind.  If any assets of the Company are distributed in kind pursuant to this Agreement, the amount of Profit or Loss that would have been realized had such assets been sold at their fair market value shall be allocated to the Capital Accounts of the Members pursuant to this Exhibit D immediately prior to such distribution.

5.2.    Classification as a Partnership.  The Executive Manager shall not make an election to treat the Company as an association pursuant to Regulation Section 301.7701-3 (and thus a corporation under Regulation Section 301.7701-2(b)(2)).

5.2.    Fiscal Year.  Except as otherwise required by the Code, the Fiscal Year of the Company for tax and accounting purposes shall be the 12 month (or shorter) period ending on the last day of December of each year.

Section 6.    Definitions.

Unless otherwise defined in this Exhibit D, all capitalized terms shall have the meanings ascribed to such terms in the Agreement or Exhibit A.

4

"Adjusted Capital Account Deficit" means, with respect to any Member for any taxable year, the deficit balance, if any, in such Member's Capital Account as of the end of such taxable year, as the same is specially computed to reflect the adjustments required or permitted to be taken into account in applying Regulations Section 1.704-1(b)(2)(ii)(d) (including any amount such Member is obligated to restore or is deemed obligated to restore under Regulation Section 1.704-2(g)(1) and 1.704-2(i)(5)).

"Book Basis" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, *however*, (a) if property is contributed to the Company, the initial Book Basis of such Property will equal its fair market value on the date of contribution, and (b) if the Capital Accounts of the Company are adjusted pursuant to Regulation Section 1.704-1(b) to reflect the fair market value of any Company assets, the Book Basis of such assets will be adjusted to equal its respective fair market value as of the time of such adjustment in accordance with such Regulation. The Book Basis of all assets will be further adjusted thereafter by depreciation or amortization as provided in Regulation Section 1.704-1(b)(2)(iv)(g).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company Minimum Gain" means "partnership minimum gain" as defined in Regulation Section 1.704-2(b)(2).

"Member Minimum Gain" means "partner nonrecourse debt minimum gain" as defined in Regulation Section 1.704-2(i)(2).

"Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Regulation Section 1.704-2(b)(4).

"Profits" and "Losses" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses will be added to taxable income or loss;

(b)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, will be subtracted from taxable income or loss;

(c)     Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by

5

reference to the Book Basis of the property, notwithstanding that the adjusted tax basis of the property differs from its Book Basis;

(d)    Any depreciation, amortization and other cost recovery deductions shall be subject to the rules set forth in Regulations Section 1.704-1(b)(2)(iv)(g); and

(e)    Profits or Losses of the Company shall be computed without regard to the amount of any items of gross income, gain, loss or deduction that are specially allocated under Section 2 hereof.

"Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar, substitute proposed or final Regulations.

6

## EXHIBIT E

## CASH MANAGEMENT

See attached.

**7**

**Kool Products, LLC**
**Cash Management**

Accounts:

| Account | Location | Signers | Bank |
|---|---|---|---|
| Depository Account | Washington | OIA,CS, DWJ | Wachovia |
| Asset Management | Washington | OIA,CS, DWJ | Wachovia |
| Operating | Nashville | PMT | Local Bank |

Receipts

1. Funding from the Members (e.g., CoolDot) will be made into the Asset Management Account.

2. All Customer payments and other receipts will be made to the Depository Account.

3. Funds received into the Depository Account will be transferred to the Asset Management Account.

4. Receipts into the Depository Account will be reported to the Nashville office daily, with backup to identify payee, invoice, etc.

Payments
1. The following will be paid directly from the Asset Management Account:
   a. Capital purchases (e.g., equipment)
   b. Material purchases
   c. Norbord production payments
   d. Debt service (if applicable)
   e. Member distributions

2. Invoices or requests for payment will be approved by PMT and faxed to the Washington office. Payment will be made by check, ACH or wire as warranted, as soon as necessary.

3. The Nashville office will pay operating expenses, payroll, rent, etc.

4. Monthly (or more often if necessary), funds will be transferred to the Operating Account to cover operating expenses. This will be based on a request of projected needs from the Nashville office.

Accounting
1. Full books of the business operations will be maintained in Nashville. This will include:
   a. All purchases, payroll and expenses.

      b. Invoicing of sales
      c. Accounts receivable and collections
      d. Inventory accounting and management
      e. All capitalized items purchased, with depreciation records
      f. Operating Account and Depository Account

2. All detail activity in the Depository Account will be communicated to the Nashville office as it occurs, where it will be recorded. The Nashville office will reconcile to the Depository Account bank statement monthly.

3. The Asset Management Account will be reconciled in the Washington office, but all activity in it will also be communicated to the Nashville office so it can be recorded there. The balance in that account can be compared to the reconciled balance per the Washington books monthly.

4. Complete financial reports will be prepared in the Nashville office, with comparison to the Business Plan. Actual reports and frequency to be determined.